UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| SHERRY L. TARRANTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:11CV 91 LMB |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Sherry L. Tarrants for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 24). Defendant filed a Brief in Support of the Answer. (Doc. No. 29).

**Procedural History**

On October 22, 2009, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on January 1, 1995.[1] (Tr. 113-19). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 25, 2011. (Tr. 39-44, 11-23).

---

[1]Plaintiff subsequently amended her alleged onset date of disability to February 2, 2008. (Tr. 14).

Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on September 23, 2011. (Tr. 10, 1-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

### Evidence Before the ALJ

**A.** **ALJ Hearing**

Plaintiff's administrative hearing was held on March 22, 2011. (Tr. 26). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Herman Litz. (Id.).

The ALJ examined plaintiff, who testified that she was fifty-two years of age, and was married. (Id.). Plaintiff stated that she had a seventh grade education. (Id.). Plaintiff testified that she had not received any kind of training since leaving school. (Tr. 27).

Plaintiff stated that she was five-feet, two-inches tall, and weighed 170 pounds. (Id.).

Plaintiff testified that she last worked in 2008. (Id.).

Plaintiff stated that she worked as an assistant manager of a gas station from 2001 through 2004. (Id.). Plaintiff testified that she operated the cash register, cooked, stocked, cleaned, and supervised four other employees at this position. (Id.). Plaintiff stated that she stood most of the day, and lifted up to thirty pounds. (Tr. 28).

Plaintiff testified that she has also worked as a cashier at a gas station. (Id.). Plaintiff stated that she stood all day at this position, and lifted up to thirty pounds. (Id.).

Plaintiff stated that she worked as a housekeeper at a hospital in 2006 and 2007. (Id.). Plaintiff testified that she cleaned rooms, cleaned floors, made beds, and assisted patients at this

position.  (Id.).

Plaintiff stated that she worked as a line worker at J. Cook.  (Tr. 29).  Plaintiff testified that she stood at this position, and lifted up to fifty pounds.  (Id.).

Plaintiff stated that she worked at a clutch factory from 1995 to 1997.  (Id.).  Plaintiff testified that she stood and lifted up to fifty pounds at this position.  (Tr. 30).

Plaintiff's attorney examined plaintiff, who testified that she has been unable to work since February 2, 2008, because she has been in a lot of pain.  (Id.).  Plaintiff stated that she is unable to stand or sit for long periods.  (Tr. 31).  Plaintiff testified that she is only able to stand in one position for five to ten minutes at a time before she has to sit due to lower back and hip pain.  (Id.).  Plaintiff stated that she is only able to sit for about thirty minutes because she experiences numbness in her left side, hip pain, and tingling in her feet.  (Id.).  Plaintiff testified that she was able to lift a gallon of milk, although she experienced pain when doing so.  (Id.).

Plaintiff stated that she underwent neck surgery in May of 2010.  (Tr. 32).  Plaintiff testified that a pain management physician prescribes pain medication for her neck impairment.  (Id.).  Plaintiff stated that she also sees Dr. Timothy Graven, who is a "bone joint doctor."  (Id.).

Plaintiff testified that the medication she takes "helps some," but does not eliminate her pain.  (Id.).  Plaintiff stated that she lies down to relieve her pain about three times a day.  (Id.).

Plaintiff testified that she experiences cramps in her hands and pain in her hips when she stands to wash dishes.  (Tr. 33).  Plaintiff stated that she also has difficulty writing, driving, holding books, and holding cups due to the problems with her hands.  (Id.).  Plaintiff testified that her hand problems are caused by her neck impairment.  (Id.).  Plaintiff stated that she also has difficulty using her arms overhead for tasks such as drying her hair or washing her hair.  (Id.).

Plaintiff testified that the neck surgery she underwent in May of 2010 did not improve her condition. (Id.). Plaintiff stated that she has limited neck motion. (Tr. 34).

Plaintiff testified that she also experiences migraines. (Id.). Plaintiff stated that she has about two migraines a week, and that she takes medication for the migraines. (Id.). Plaintiff testified that she has to lie down in a dark, quiet room when she has a migraine. (Id.).

Plaintiff stated that she has a seventh grade education. (Tr. 35). Plaintiff stated that she is able to read the newspaper. (Id.). Plaintiff testified that she has difficulty with spelling. (Tr. 35). Plaintiff stated that she is able to add and subtract if she has a paper and pencil. (Id.). Plaintiff testified that she may have difficulty with multiplication and division. (Id.).

Plaintiff stated that she does not sleep well at night due to difficulty breathing and pain. (Id.). Plaintiff testified that she wakes about every hour during the night. (Id.).

The ALJ re-examined plaintiff, who testified that her biggest problem preventing her from working was her neck and back pain. (Tr. 36). The ALJ noted that he had observed plaintiff moving her head "completely normal," and bending during the hearing. (Id.). Plaintiff testified that she is unable to lift or sit or stand for long periods. (Id.). Plaintiff stated that, while she is able to turn her head, she experiences pain when doing so. (Id.). Plaintiff testified that she also experiences pain in her left hip and leg. (Id.).

Plaintiff stated that her lack of education was another problem preventing her from working. (Id.).

The ALJ examined vocational expert Herman Litz, who testified that plaintiff's past relevant work was classified as follows: cashier (light, unskilled); housekeeper (medium, unskilled); line worker (medium, unskilled); and assistant manager (light, semi-skilled). (Tr. 37).

**B.      Relevant Medical Records**

The record reveals that plaintiff underwent an MRI of the right shoulder on January 30, 2007, which revealed findings consistent with a partial tear of the supraspinatus tendon. (Tr. 250). Plaintiff also underwent an MRI of the cervical spine, which revealed significant degenerative disk disease at the C5-6 and C6-7 levels; and focal disk protrusion to the right of the midline at the C5-6 level, which is probably associated with mild compressions of the spinal cord and adjacent nerve roots. (Tr. 251).

Plaintiff presented to surgeon Bradley E. Buchanan, M.D. on February 2, 2007, with complaints of neck pain radiating down into her right shoulder and arm. (Tr. 275). Plaintiff reported that she had been experiencing these symptoms for several years, but they worsened in December of 2006 and had not responded to conservative therapy. (Id.). Dr. Buchanan administered an epidural steroid injection. (Id.).

Plaintiff received treatment at Crider Health Center from April 2008 through September 2009 for various complaints, including back pain, leg numbness, neck pain, depression, and difficulty sleeping. (Tr. 212-35).

Plaintiff underwent a sleep study on October 2, 2008, which revealed no evidence of sleep apnea. (Tr. 242).

On November 11, 2008, plaintiff was referred to a behavioral health specialist due to complaints of increased stress and sleep disturbances. (Tr. 222).

Plaintiff presented to Timothy G. Graven, D.O. on August 27, 2009, with complaints of neck and low back pain, with radiation into the upper and lower extremities; and numbness, tingling, and some weakness. (Tr. 291). Plaintiff reported that her symptoms had been ongoing

and that she was taking anti-inflammatories. (Id.). Upon examination, plaintiff had full cervical spine range of motion, and her cervical nerves were intact. (Id.). Plaintiff's lumbar spine straight leg raise test was positive bilaterally for buttock pain. (Id.). Plaintiff's sensory exam was normal, and she was able to heel and toe walk. (Id.). Dr. Graven indicated that x-rays of the lumbar spine were essentially normal, while x-rays of the cervical spine showed degenerative disc disease with spur formation and loss of disc height at C5-6 and C6-7. (Id.). Dr. Graven ordered an MRI, and prescribed Medrol.[2] (Id.).

Plaintiff underwent an MRI of the cervical spine on September 9, 2009, which revealed small central disc herniation and diffuse disc bulge at C6-7 with moderate left and milder right neuroforaminal stenosis and moderate impression on the ventral thecal sac; moderate spondylosis[3] at C5-6 with moderate bilateral neuroforaminal stenosis and mild central canal stenosis.[4] (Tr. 293). An MRI of the lumbar spine was negative for disc herniation or stenosis, but revealed mild facet joint arthropathy[5] bilaterally at L4-5 and L5-S1. (Tr. 294).

Plaintiff saw Dr. Graven for follow-up on September 10, 2009, at which time Dr. Graven recommended that plaintiff begin physical therapy. (Tr. 295). Dr. Graven prescribed Medrol and Celebrex.[6] (Id.).

---

[2]Medrol is a steroid indicated for the treatment of arthritis. See WebMD, http://www.webmd.com/drugs (last visited February 4, 2013).

[3]A general term for any lesion of the spine of a degenerative nature. Stedman's Medical Dictionary, 1813 (28th Ed. 2006).

[4]Narrowing of the spinal canal. Stedman's at 1832.

[5]Any disease affecting a joint. Stedman's at 161.

[6]Celebrex is indicated for the treatment of osteoarthritis. See Physician's Desk Reference ("PDR"), 2981 (63rd Ed. 2009).

Plaintiff presented to Dr. Graven on October 22, 2009, at which time she reported that she was not doing much better and experienced no relief with physical therapy. (Tr. 297). Plaintiff complained of ongoing neck and back pain with radiation to the left lower extremity and left upper extremity. (Id.). Dr. Graven referred plaintiff to pain management and for epidural steroid injections. (Id.).

The record reveals that plaintiff attended five out of twelve physical therapy visits and responded fair to physical therapy intervention. (Tr. 198). Plaintiff reported that she wished to stop therapy and try pain management. (Id.).

Plaintiff received treatment at Crider Health Center from November 2009 through September 2010 for routine checkups, as well as complaints of allergies, sinus symptoms, urinary problems, and neck pain. (Tr. 340-48).

Plaintiff saw Dr. Graven on December 3, 2009, at which time she reported that her neck pain was "a little better" with a cervical epidural injection, but she was still having neck pain and some arm problems. (Tr. 323).

Plaintiff presented to Dr. Graven on February 11, 2010, to discuss treatment options after her pain management physician indicated that he could not do anything further for her. (Tr. 324). Plaintiff had undergone multiple injections and conservative treatment including physical therapy and traction, anti-inflammatory medications, and rest. (Id.). Plaintiff reported an incapacitating pain. (Id.). Plaintiff complained of neck pain and arm pain equally, numbness and tingling, and weakness. (Id.). Dr. Graven indicated that plaintiff had failed all other conservative treatment, and that plaintiff would undergo surgery. (Id.).

On May 17, 2010, Dr. Graven performed an anterior cervical diskectomy[7] and fusion at C5-6 and C6-7. (Tr. 308, 338). Plaintiff's post-operative diagnoses were cervical spondylosis, degenerative disk disease, and radiculopathy.[8] (Id.).

Plaintiff presented to Dr. Graven for a post-surgical examination on June 24, 2010, at which time plaintiff reported some bilateral shoulder aching but no back symptoms. (Tr. 329). Dr. Graven's assessment was slow post-op progress. (Id.). He indicated that x-rays revealed satisfactory graft and hardware alignment. (Id.). On August 5, 2010, Dr. Graven indicated that plaintiff was still experiencing "quite a bit" of shoulder pain. (Tr. 331). Plaintiff still reported some posterior neck pain. (Id.). Dr. Graven ordered an MRI. (Id.). On August 20, 2010, Dr. Graven indicated that plaintiff's MRI revealed no significant canal encroachment. (Tr. 332). Plaintiff still reported bilateral trapezius pain with some pain in her left arm. (Id.). Plaintiff also had some left leg radicular symptoms. (Id.). Dr. Graven prescribed Vicodin[9] and referred plaintiff to Dr. Shelton for evaluation and treatment. (Id.).

Plaintiff presented to Chad C. Shelton, M.D. at Professional Pain Physicians on September 23, 2010, with complaints of neck pain and pain radiating into her left upper arm and shoulders. (Tr. 362). Plaintiff did not report a significant amount of overall pain relief following surgery but she did report significant relief in the neck area. (Id.). Plaintiff complained of difficulty sleeping due to hypersensitivity and muscular tenderness throughout her shoulders, back, and legs, as well

---

[7]Excision, in part or whole, of an intervertebral disk. Stedman's at 550.

[8]Disorder of the spinal nerve roots. Stedman's a 1623.

[9]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 529.

as headaches. (Id.). Plaintiff reported an occasional tingling throughout multiple areas in her upper extremities and various joint aches. (Id.). Upon examination, plaintiff had normal range of motion of the cervical spine, full motor strength bilaterally throughout, normal gait, intact sensation, and full straight leg raising. (Tr. 363). Dr. Shelton noted lumbar paraspinal tenderness. (Id.). Dr. Shelton noted musculoskeletal tender points consistent with fibromyalgia.[10] (Id.). Dr. Shelton's assessment was unspecified myalgia[11] and myositis;[12] and brachial neuritis[13] or radiculitis[14] not otherwise specified. (Tr. 362). He indicated that plaintiff has a fair amount of pain consistent with fibromyalgia. (Id.). Plaintiff had diffuse tenderness and muscular pain. (Id.). Dr. Shelton started plaintiff on a trial of Lyrica[15] and Skelaxin.[16] (Id.).

Plaintiff presented to Dr. Shelton for follow-up on October 21, 2010, at which time Dr. Shelton noted that the Lyrica and Skelaxin had helped plaintiff significantly. (Tr. 364). Plaintiff reported about fifty percent overall improvement and improved function. (Id.). Plaintiff reported some tightness in her muscular areas of her shoulders. (Id.). Upon examination, Dr. Shelton

---

[10] A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. Stedman's at 725.

[11] Muscular pain. Stedman's at 1265.

[12] Inflammation of a muscle. Stedman's at 1275.

[13] A neurologic disorder, of unknown cause, characterized by the sudden onset of severe pain, usually about the shoulder and often beginning at night, soon followed by weakness and wasting of various forequarter muscles, particularly shoulder girdle muscles. Stedman's at 70.

[14] Disorder of the spinal nerve roots. Stedman's at 1622.

[15] Lyrica is indicated for the treatment of neuropathic pain, post herpetic neuralgia, and fibromyalgia. See PDR at 2527.

[16] Skelaxin is indicated for the relief of discomforts associated with acute, painful musculoskeletal conditions. See PDR at 1785.

noted lumbar paraspinal tenderness, and some tenderness in plaintiff's trapezius and scapular areas. (Id.). Dr. Shelton's assessment was unspecified myalgia and myositis; and brachial neuritis or radiculitis. (Id.). Dr. Shelton continued plaintiff on her medication regimen, noting that plaintiff reported good relief without significant side effects. (Id.).

Plaintiff presented to Dr. Graven for follow-up on October 28, 2010, at which time Dr. Graven noted that plaintiff was doing better with pain management. (Tr. 368).

Plaintiff presented to Dr. Shelton on January 27, 2011, at which time she complained of neck and bilateral arm pain. (Tr. 375). Plaintiff also reported cramps in her hand and problems with dropping things. (Id.). Plaintiff described her arm pain as numbness and tingling, and the pain in her neck as achy. (Id.). Plaintiff indicated that she was continuing to take Lyrica and Skelaxin with "good relief." (Id.). Upon examination, Dr. Shelton noted tenderness to palpation of the cervical paraspinous muscles. (Id.). Plaintiff had full motor strength bilaterally throughout, and intact sensation. (Id.). Dr. Shelton's assessment was brachial neuritis or radiculitis nos (primary); and unspecified myalgia and myositis. (Id.). Dr. Shelton increased plaintiff's dosage of Lyrica. (Id.).

## C.  Evidence Submitted to the Appeals Council

In a letter addressed "To Whom It May Concern" dated February 10, 2011, Dr. Graven stated that plaintiff was having difficulties following her intercervical discectomy and fusion. (Tr. 380). Dr. Graven stated that plaintiff's difficulties included prolonged episodes of neck pain, difficulty swallowing, and some weakness in the upper extremities. (Id.). Dr. Graven indicated that plaintiff also has a diagnosis of lumbar radiculopathy. (Id.). Dr. Graven stated that plaintiff's recuperative period has been prolonged. (Id.). Dr. Graven stated "[a]t this time I find her

unsuitable for returning to the full time work force because she is unable to stand, walk or sit for prolonged periods of time without at least a fifteen minute rest." (Id.). Dr. Graven continued, "[h]er condition may improve in the future with regards to her neck, but her low back problems may become worse." (Id.).

### **The ALJ's Determination**

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2. The claimant has not engaged in substantial gainful activity since February 2, 2008, the amended alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease; and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) (occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; with unlimited ability to push and/or pull (including operation of hand and/or foot controls) other than as shown for list and/or carry).

6. The claimant is capable of performing past relevant work as a cashier and an assistant manager. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2008, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 16-20).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on October 13, 2009, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 20).

## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

### B. The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next argues that the ALJ erred in finding that plaintiff could return to her past relevant work. The undersigned will address plaintiff's claims in turn.

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) (occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; with unlimited ability to push and/or pull (including operation of hand and/or foot controls) other than as shown for list and/or carry).

(Tr. 18).

In determining plaintiff's RFC, the ALJ first assessed the credibility of plaintiff's subjective

- 15 -

complaints of pain and limitations under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. 739 F.2d at 1322.

The ALJ stated that plaintiff's function report reflects a greater level of activity than did her testimony. (Tr. 19). The ALJ pointed out that plaintiff reported in her function report that she cares for her husband and dog, prepares simple foods, does laundry, goes outside a couple times per day, drives, goes grocery shopping, manages money, goes fishing, and has coffee with her mother. (Tr. 19, 152-55). The ALJ also noted that plaintiff went on vacation to Aruba in early 2009, and went out of town in June 2009 to care for her sister. (Tr. 19, 218, 214). The ALJ found that these inconsistencies detracted from plaintiff's overall credibility. (Tr. 19).

The ALJ next noted that plaintiff reported in April 2008 that she had been off all medication for almost one year. (Tr. 19, 233). The ALJ stated that plaintiff's symptoms have improved with treatment, noting that plaintiff reported a fifty percent improvement in functioning from Lyrica and Skelaxin. (Tr. 19, 364).

The ALJ stated that, "taking into account the record as a whole, including the aforementioned *Polaski* factors, the undersigned concludes that the claimant has the capacity to perform the ful range of light work, as set out in the residual functional capacity above." (Tr. 20).

Plaintiff does not challenge the ALJ's credibility analysis but, rather, contends that the ALJ erred in finding plaintiff had the RFC to perform the full range of light work. Plaintiff argues that the ALJ did not cite any medical evidence in support of his decision, and that the ALJ's

determination is inconsistent with the opinion of treating physician Dr. Graven.

In a letter dated February 10, 2011, Dr. Graven stated that plaintiff was having difficulties following her intercervical discectomy and fusion, including prolonged episodes of neck pain, difficulty swallowing, and some weakness in the upper extremities. (Tr. 380). Dr. Graven indicated that plaintiff also has a diagnosis of lumbar radiculopathy. (Id.). Dr. Graven stated "[a]t this time I find her unsuitable for returning to the full time work force because she is unable to stand, walk or sit for prolonged periods of time without at least a fifteen minute rest." (Id.). Dr. Graven continued, "[h]er condition may improve in the future with regards to her neck, but her low back problems may become worse." (Id.).

Dr. Graven's letter was submitted to the Appeals Council after the ALJ issued his decision. (Tr. 1-4). The Appeals Council indicated that it had considered Dr. Graven's letter, and found that it did not provide a basis for changing the ALJ's decision. (Tr. 1-4). In these circumstances, this court does not evaluate the Appeals Council's decision to deny review based on new evidence; instead, the role of this court is limited to deciding whether the ALJ's determination is supported by substantial evidence on the record as a whole, including new evidence submitted after determination was made. See Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) ("Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence.").

The undersigned finds that the ALJ's RFC determination is not supported by substantial evidence. At the time the ALJ issued his decision, there was no medical evidence in the record regarding plaintiff's ability to function in the workplace. The ALJ acknowledged that the record

did not even contain an assessment from a state agency medical consultant. (Tr. 19).

The ALJ's RFC determination was based primarily on the ALJ's credibility analysis. The ALJ properly pointed out that plaintiff had gone on a vacation in early 2009 and traveled to help care for her sister in June 2009. (Tr. 19). While these activities appear inconsistent with allegations of disability, plaintiff subsequently underwent neck surgery in May 2010 after failing all other conservative treatment. (Tr. 324, 308). The ALJ also noted that plaintiff reported fifty percent improvement from medication in October 2010. (Tr. 364). The fact that plaintiff's condition was fifty percent improved, however, does not support the ability to perform the full range of light work. Further, plaintiff subsequently reported increased symptoms. (Tr. 375).

As previously noted, Dr. Graven expressed the opinion that plaintiff was unable to stand, walk, or sit for prolonged periods of time without at least a fifteen minute rest. (Tr. 380). The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007).

Dr. Graven was plaintiff's treating orthopedic surgeon, and had been treating plaintiff regularly since August 2009. In a June 2010 post-operative visit, plaintiff complained of bilateral shoulder pain and neck pain. (Tr. 331). In August 2010, plaintiff continued to complain of bilateral shoulder and neck pain. (Tr. 332). Plaintiff also reported pain in her left arm, and left leg radicular symptoms. (Id.). Dr. Graven prescribed Vicodin and referred plaintiff to a pain management physician. (Id.). In October 2010, Dr. Graven indicated that plaintiff was doing

better with pain management. (Tr. 368). On plaintiff's most recent pain management visit, however, plaintiff complained of neck and bilateral arm pain. (Tr. 375). Plaintiff also reported cramps in her hands and indicated that she had been dropping items. (Id.). On examination, tenderness was noted to palpation of the cervical paraspinous muscles. (Id.). Plaintiff's dosage of Lyrica was increased.

In light of Dr. Graven's opinion, the ALJ's RFC determination is not supported by substantial evidence. Dr. Graven's opinion is consistent with his treatment notes and the record as a whole. Significantly, no other physician expressed an opinion regarding plaintiff's work-related limitations.

Plaintiff also argues that the ALJ erred in finding that plaintiff could return to her past relevant work. After determining that plaintiff was capable of performing the full range of light work, the ALJ found that plaintiff could perform her past relevant work as a cashier and an assistant manager. (Tr. 20). As discussed above, the ALJ's finding that plaintiff was capable of performing the full range of light work is not supported by substantial evidence. Thus, the ALJ's determination that plaintiff was capable of performing past relevant work is also unsupported by substantial evidence.

## Conclusion

In sum, the ALJ erred in determining plaintiff's residual functional capacity. The residual functional capacity formulated by the ALJ is inconsistent with the opinion of plaintiff's treating

physician, Dr. Graven. Thus, this cause will be reversed and remanded to the ALJ in order for the ALJ to reevaluate plaintiff's residual functional capacity in light of Dr. Graven's opinion; and then to continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  28th  day of February, 2013.

*Lewis M. Blanton*
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE